**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America,       ) | CR 10-841-PHX-JAT |
|                        ) |  |
| Plaintiff,       ) | **ORDER** |
|                        ) |  |
| vs.                        ) |  |
|                        ) |  |
| Clinton Dean Pavelich,       ) |  |
|                        ) |  |
| Defendant.       ) |  |
|                        ) |  |

Defendant is charged with two counts of violating the Lacey Act, 16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B), and two counts of Theft of Government Property under 18 U.S.C. § 641. Defendant challenges the voluntariness of statements he made during three interviews in his home with special agents from the Bureau of Land Management because he was only advised of his *Miranda* rights during the second interview. For the reasons that follow, the Court finds that Defendant's statements were voluntary.

**I.     BACKGROUND**

On March 4, 2010, at approximately 12:50 p.m., Special Agents Robert Vaitkus ("SA Vaitkus") and Robert Ruiz ("SA Ruiz") from the Bureau of Land Management ("BLM") arrived at Clinton Dean Pavelich's ("Defendant") home in Apache Junction, Arizona. The agents had a warrant authorizing them to search Defendant's garage, yard, and truck to obtain evidence of crimes related to the alleged theft and offering for sale of saguaro cacti taken from federal land. The team tasked with executing the search warrant also included three

1  additional special agents and eight law enforcement rangers who were instructed to arrive
2  separately.

3        SA Vaitkus and SA Ruiz knocked on the front door and called Defendant's home
4  telephone number, but there was no answer. SA Vaitkus walked around the home, noting
5  that the door to a motor home parked on the property was open. He testified that the agents
6  were aware Defendant had a concealed weapon permit and were concerned someone might
7  be hiding on the property. As a result, SA Vaitkus called the additional agents and rangers
8  to the home, and they arrived at 1:00 p.m.

9        Approximately four agents climbed over a wall and approached the rear entrance with
10 their weapons drawn. The sliding glass door was open, with the screen door pulled closed.
11 All but one of the window shades were open. After Law Enforcement Ranger Gerald Tuma
12 ("LER Tuma") knocked on the window with the closed shade for about ten seconds, a voice
13 called out "yes." LER Tuma yelled, "Police, come to the door." Defendant came into view,
14 hung his head, and said, "I should have known." LER Tuma directed Defendant to walk
15 through the home and exit out the front door. LER Tuma and Special Agent Stevens ("SA
16 Stevens") escorted Defendant through the house to the front door, where SA Vaitkus and SA
17 Ruiz were waiting. Once Defendant was outside, SA Vaitkus told LER Tuma to frisk
18 Defendant for weapons. After determining that he was unarmed, Defendant was released and
19 all agents holstered their weapons.

20       Defendant consented to a sweep of the home's interior, and agents determined that
21 Defendant was alone. SA Vaitkus introduced himself and SA Ruiz to Defendant. Both SA
22 Vaitkus and SA Ruiz were in plainclothes and kept their weapons holstered. SA Vaitkus
23 explained that they were there to execute a search warrant regarding Defendant's saguaro
24 business. SA Vaitkus told Defendant he was not under arrest. He asked Defendant if he and
25 SA Ruiz could speak to him in his kitchen. Defendant consented and led them through the
26 house.

27       Defendant and SA Vaitkus sat at the kitchen table with Defendant nearest the
28 entryway. SA Ruiz stood in a corner but did not block the entryway. The other agents were

1  not present in the home during the interview but remained on the property.  SA Vaitkus told
2  Defendant he did not have to talk to the agents if he did not want to and reminded Defendant
3  that he was not under arrest.  Defendant agreed to speak with the agents.

4        SA Vaitkus gave Defendant a copy of the search warrant and explained that the agents
5  were investigating saguaro thefts from federal land near Freeman Road.  SA Vaitkus also
6  showed Defendant a photograph BLM agents had taken of Defendant's truck with saguaros
7  in the back.  SA Vaitkus told Defendant that he was going to record the conversation, but that
8  Defendant could ask him to turn off the recorder at any time.  Defendant consented to the
9  recording, which began at 12:57 p.m.  (Doc. #16, Ex. 1, at 2.)

10       Near the start of the interview, SA Vaitkus asked Defendant where the three saguaros
11 in his truck originated.  (*Id.*)  Defendant responded, "I don't know what I want to say. I don't
12 know if I want to talk."  (*Id.* at 3.)  SA Vaitkus did not respond to Defendant's statement and
13 continued to question him.  After two additional questions, SA Vaitkus asked, "When you
14 say you didn't want to say, what do you mean by that?"  (*Id.* at 4.)  Defendant responded, "I
15 don't know if I should have a lawyer right now -- if we're getting into this, this deep."  (*Id.*)
16 SA Vaitkus responded, "that's up to you at any time, okay?  If you want an attorney or
17 whatever just tell me, whatever.  I mean tell me not to ask any more questions.  Or if you
18 don't want to talk to me, you don't have to."  (*Id.*)  Without waiting for a response, SA
19 Vaitkus continued, "But we think you have some saguaros that are taken from BLM land
20 without permission.  Did you remove anything from BLM?"  (*Id.* at 4-5.)

21       SA Vaitkus told Defendant that he could not make any promises or tell him that he
22 would not be charged but would tell the U.S. Attorney who issued the warrant if Defendant
23 was cooperative.  (*Id.* at 5, 45.)  SA Vaitkus also told Defendant to point out which saguaros
24 were stolen "so I won't be here until freaking midnight."  (*Id.* at 6.)

25       Defendant admitted to taking saguaro cacti without permission from what he assumed
26 were public lands.  (*Id.* at 6, 10, 14, 17-22.)  He agreed to show the agents where the stolen
27 cacti were located in his yard.  (*Id.* at 26-28, 31-32, 36, 46.)  He also consented to the search
28

1  of another vehicle, the seizure of an additional saguaro, and the use of his trailer to remove
2  the saguaros from his property. (*Id.* at 47, 51.)

3  During the interview, the telephone rang several times. When Defendant's wife
4  called, the agents permitted him to answer. (*Id.* at 20-21.) Defendant asked if he should tell
5  her that the agents were present, but SA Vaitkus said "no." (*Id.* at 21). At one point,
6  Defendant asked the agents if they wanted water. (*Id.* at 22.) SA Vaitkus testified, and a
7  review of the audio recording confirms, that the tone of the interview was calm, cooperative,
8  and polite. The interview lasted approximately fifty-five minutes. (*See id.* at 2, 51.)

9  SA Vaitkus later resumed questioning Defendant in his kitchen. Prior to restarting the
10 recording, SA Vaitkus presented Defendant with an Advice of Rights and Consent to Search
11 form, which he read to Defendant. This form advised Defendant of his *Miranda* rights. SA
12 Vaitkus testified that Defendant signed the form and agreed to continue the interview. SA
13 Vaitkus stated at the start of the recording that Defendant had circled the location on a map
14 of nine saguaros he had taken in the prior week and fifty saguaros he had taken in the past
15 year. (*Id.* at 51-52.) Defendant again admitted to taking saguaros from public land without
16 permission. (*Id.* at 61-62.) The second interview lasted about fifteen minutes.

17 At some point between March 4, 2010 and March 9, 2010, Defendant called SA
18 Vaitkus to inquire about the return of his trailer. They arranged to meet at Defendant's home
19 on March 9. LER Robinson accompanied SA Vaitkus to Defendant's home on that date. SA
20 Vaitkus asked if they could talk in Defendant's kitchen, and Defendant agreed. SA Vaitkus
21 testified that Defendant was not restrained at any point. SA Vaitkus did not advise
22 Defendant of his *Miranda* rights, and the interview was not recorded. Defendant again made
23 inculpatory statements.

24 **II. DISCUSSION**

25 Defendant challenges the voluntariness of statements he made both before and after
26 being advised of his *Miranda* rights. For a statement to be admissible against a defendant,
27 the statement must have been voluntarily made. One part of the voluntariness inquiry is
28 whether *Miranda* warnings were given.

### A. *Miranda* Warnings

*Miranda* warnings are not required unless law enforcement agents interrogate a person who is in custody. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Whether a person was in custody during questioning focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the suspect. *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004).

In determining whether a suspect was in custody during an interview in his home, courts consider: (1) the number of law enforcement personnel present and whether they were armed; (2) whether the suspect was restrained at any point; (3) whether the suspect was isolated from others; (4) whether the suspect was informed that he was free to leave or terminate the interview and the context in which such statements were made; (5) the language used to summon the individual; (6) the extent to which the suspect was confronted with evidence of guilt; (7) the physical surroundings of the interrogation; (8) the duration of the detention; and (9) the degree of pressure exerted to detain the suspect. *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009); *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

Turning to the first factor, thirteen armed law enforcement officers were present to execute the search warrant at Defendant's home. SA Vaitkus testified that the search warrant team's size was based on their anticipation of seizing a large number of heavy saguaros from the property. The team planned to have only SA Vaitkus and SA Ruiz present during the initial encounter with Defendant, with the other agents and rangers arriving later to assist with removing the saguaros. However, they modified the plan when Defendant did not answer the door or the telephone and the agents became concerned for their safety. SA Vaitkus called the team to the home, and four officers climbed the fence and approached the back of the home with their weapons drawn. Once the officers determined that Defendant was unarmed, they holstered their weapons. SA Vaitkus and SA Ruiz did not draw their weapons during any portion of the interview.

The second factor is whether the defendant was restrained. SA Vaitkus and LER Tuma testified that Defendant was not physically restrained other than while being frisked. Upon making initial contact with Defendant, LER Tuma and SA Stevens walked with him through the house to the front door. Then LER Tuma frisked him for weapons. Defendant was seated nearest the entryway to the kitchen during the interview. SA Vaitkus sat across the table from Defendant, and SA Ruiz stood in the corner opposite the entry. The doorway was not blocked, and no other officers were present. While Defendant was not left alone during the three hours the agents remained on his property, he was permitted to make and answer telephone calls, use the bathroom, and walk both inside and outside the home. During the interview, LER Tuma stayed in his patrol vehicle in Defendant's driveway to prevent any unauthorized entry, but he testified that he was not instructed to prevent Defendant from leaving.

The third factor is whether the defendant was isolated. Defendant was the only person home when the search warrant was executed. When Defendant's wife called during the interview, the agents did not prevent him from answering the telephone. (Doc. #16, Ex. 1, at 20-21.) However, SA Vaitkus told Defendant not to inform his wife that the agents were present because they also wanted to interview her. When Defendant's wife arrived home, he was permitted to speak with her.

The fourth factor is whether the defendant was told he was free to leave or otherwise terminate the encounter. After introducing himself and SA Ruiz to Defendant, SA Vaitkus testified that he advised Defendant that he was not under arrest. After Defendant led the agents to the kitchen, SA testified that he asked Defendant if he would answer some questions, reminded him that he was not under arrest, and advised him that he did not have to talk. SA Vaitkus asked for permission to record the interview and told Defendant he could ask him to turn off the recorder at any time. While law enforcement vehicles were parked blocking Defendant's driveway, LER Tuma testified that he was not instructed to prevent Defendant from leaving. However, SA Vaitkus did not inform Defendant he was free to leave.

- 6 -

The fifth factor is the language used to summon the defendant. LER Tuma testified that he yelled to Defendant, "police, come to the door." After Defendant complied, LER Tuma testified that he directed Defendant to walk through the home to the front door. Once agents determined that Defendant was unarmed and alone, the tone changed. SA Vaitkus asked permission to enter the home and to speak with Defendant in the kitchen. SA Vaitkus testified, and a review of the recording confirms, that the interviews were calm and conversational.

The sixth factor is the extent to which the defendant was confronted with evidence of his guilt. SA Vaitkus gave Defendant a copy of the search warrant and explained they were investigating thefts of saguaro cacti from federal lands. He told Defendant they suspected him of stealing cacti and showed Defendant a photograph BLM agents had taken of saguaros in the back of his truck. However, Defendant was not aggressively confronted with evidence of his guilt, nor was the evidence presented overwhelming.

The seventh factor is the physical surroundings of the interrogation. The interviews took place in Defendant's kitchen. The kitchen door was open during the interviews, and the kitchen had a window overlooking the driveway and street. Defendant was seated nearest the door. SA Vaitkus sat across the table from him, and SA Ruiz stood in a corner opposite the door, about ten feet from Defendant. SA Vaitkus testified that SA Ruiz was in the kitchen to provide security because the agents were aware Defendant had a concealed weapons permit but had not searched the home for weapons. The other agents and rangers remained on the property but were not present in the home during the interview.

The eighth factor is the duration of the detention. The first interview lasted approximately fifty-five minutes, and the second took about fifteen minutes. In total, the agents were on Defendant's property for approximately three hours on March 4.

The ninth factor is the degree of pressure exerted to detain the suspect. Once the agents determined that Defendant was unarmed and alone, they exerted little, if any, pressure on him. SA Vaitkus asked permission to enter the home, reminded Defendant several times

that he was not under arrest and did not have to speak with the agents, and told him that he could ask to turn off the recorder at any time.

In evaluating the factors for determining whether a suspect was in custody while being interviewed in his home, the Court finds that Defendant was not subjected to lengthy questioning or isolated from others. He was allowed to answer the phone when his wife called, and he was permitted to speak with her when she arrived home. While the team included thirteen armed officers, only two officers were present inside the home at any given time. Defendant was not handcuffed, and SA Vaitkus asked whether he would be willing to answer questions. SA Vaitkus informed Defendant multiple times that he was not under arrest and that he did not have to speak to the agents. The interview took place in Defendant's kitchen. Only two agents were present during the interview. Neither SA Vaitkus nor SA Ruiz wore protective gear, and both kept their weapons holstered. The tone of the interview was calm and polite.

Defendant was never left alone, but he was permitted to make and answer telephone calls, use the bathroom, and walk inside and outside the home. While patrol vehicles blocked his driveway, and LER Tuma was instructed to prevent any unauthorized entry onto the property, Defendant was informed that his wife would be permitted to enter.

The Court concludes that these factors weigh in favor of finding that Defendant was not in custody during the interview, and *Miranda* warnings were therefore not required.

In the alternative, if Defendant had been in custody on March 4, the unwarned inculpatory statements he made during the first interview would not be admissible. And administering the *Miranda* warnings prior to the start of the second interview would not have been sufficient to remove the taint of the first unwarned statements where SA Vaitkus testified that he deliberately refrained from administering the *Miranda* warnings until after Defendant confessed. *See United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007) (holding that where officers deliberately use a two-step interrogation technique in which they elicit an unwarned confession, administer the *Miranda* warnings, and then elicit a repeated confession, "the district court must suppress post-warning statements unless the

- 8 -

1 interrogators take curative measures to apprise the defendant of his rights") (citing *Missouri v. Seibert*, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring); *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006))). However, the statements Defendant made during the third interview on March 9 would be admissible because the encounter was scheduled at Defendant's request, five days had passed since the earlier interviews, only two officers were present on the property, and Defendant was not in custody. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring) (noting curative measures might include a substantial break in time and circumstances between two interrogations).

### B. Voluntariness

Since Defendant was not entitled to *Miranda* warnings, the remaining inquiry is whether his statements were voluntary. A "confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002), *cert. denied* 123 S.Ct. 449 (2002). Impermissible coercive activity can include lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion. *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992). When a suspect alleges psychological coercion, the relevant question is whether the suspect's will was overborne when he confessed. *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993).

Because Defendant has not alleged physical coercion, and he was not subjected to lengthy questioning, the Court looks to testimony from the evidentiary hearing to determine psychological coercion. SA Vaitkus told Defendant that he would inform the prosecutor of any cooperation by Defendant. But a statement made as a result of a promise does not render the statement involuntary unless the promise was "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). "An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect." *Id.*

1  More than an hour after the start of the first interview, SA Vaitkus provided
2  Defendant a written statement of his *Miranda* rights, which he read to Defendant.  SA
3  Vaitkus testified that Defendant understood his rights, waived them, and was willing to
4  continue the interview.  Defendant again stated that he took saguaro cacti without permission
5  from what he believed were public lands.

6  Further, there is no evidence that SA Vaitkus used coercive means to undermine
7  Defendant's ability to exercise his free will.  *See Pollard*, 290 F.3d at 1033; *Kelley*, 953 F.2d
8  at 565.  Defendant was not physically restrained.  Between the interviews, Defendant was
9  permitted to freely greet his wife.  At the start of the second interview, which lasted only
10 about thirteen minutes, Defendant was again advised that he was not under arrest and that he
11 did not have to talk if he chose not to.

12 Finding no evidence that Defendant's will was overborne during the interviews on
13 March 4, the Court concludes the statements Defendant made that day were voluntary.  In
14 addition, there is no evidence that the third interview on March 9 was coercive.  Accordingly,
15 the Court finds that Defendant's statements made on March 9 were also voluntary.

16 Based on the foregoing,

17 IT IS ORDERED that Defendant's request for a voluntariness hearing (Doc. 9) is
18 granted to the limited extent that the Court has conducted a voluntariness hearing and denied
19 to the extent such request seeks to suppress Defendant's statements as involuntarily made.

20 DATED this 14th day of October, 2010.

_____
James A. Teilborg
United States District Judge

- 10 -